# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

DIANA CARROLL, as Special )
Administrator of the Estate of )
RODNEY JAMES CARROLL, )
deceased, )
                                  )
           Plaintiff, )
                                  )
     v. )   Case No. CIV-15-674-D
                                  )
UNITED STATES OF AMERICA, )
                                  )
           Defendant. )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court conducted a bench trial in this matter beginning on February 22, 2017 and concluding on February 24, 2017. Plaintiff, Diana Carroll as Special Administrator of the Estate of Rodney James Carroll, Deceased ("Plaintiff" or "D. Carroll"), appeared in person and through counsel John P. Zelbst, David Butler, and Clay Zelbst. Defendant, United States of America, appeared through Assistant United States Attorneys Rebecca A. Frazier, Amanda R. Johnson, and Daniel J. Card. At the conclusion of the evidence, the Court took the matter under advisement, and now issues its ruling as set forth herein.

## FINDINGS OF FACT

1. In this case, Plaintiff D. Carroll presents a cause of action for the wrongful death of her husband, Rodney James Carroll ("Mr. Carroll" or "R.

Carroll"). Mr. Carroll was killed on March 1, 2014, as he rendered assistance to motorists in a disabled vehicle on the H.E. Bailey Turnpike, Interstate Highway 44 ("I-44"), at about 11:05 p.m. in Grady County, Oklahoma. Mr. Carroll was struck when a school bus driven by Laughter Smith, acting within the scope of his employment with Defendant, collided with the disabled vehicle.

2. Earlier on the evening of March 1, 2014, Mr. Carroll picked Plaintiff up at the airport in Oklahoma City, and they drove toward their hometown of Chickasha, Oklahoma heading southwest on I-44.

3. Trooper Shane Fitzwater, an 18-year veteran of the Oklahoma Highway Patrol (OHP), was on duty on March 1, 2014. He testified that the OHP was expecting rain, sleet, and icy road conditions late that evening. Multiple witnesses, including Trooper Fitzwater, testified that sometime just before 11:00 p.m., the weather started to deteriorate rapidly. When the Carrolls drove past the I-44 toll booth at mile marker 97 – about seven miles from the collision site at mile marker 90 – Plaintiff noticed precipitation accumulating on the windshield of the Carrolls' car.

4. Laughter Smith ("Smith") is employed at the Riverside Indian School in Anadarko, Oklahoma as the school's Residential Life Manager. On March 1, 2014, he was the school's Dean of Students. He has an Oklahoma Commercial Driver's License and a bus driver certification. He has, as an additional duty, been

2

driving a bus for Riverside for the last six or seven years. *See* Plaintiff's Ex. ("Pl. Ex.") 2.[1]

5. On March 1, 2014, Smith volunteered to drive a Riverside bus transporting thirty female students and two faculty chaperones from Anadarko to Moore (near Oklahoma City) to see a movie and have dinner afterward. The driving time would be about an hour each way. The bus left Anadarko around 5:30 p.m. Smith checked the weather before departing, and was aware there was a chance that winter weather – specifically icy precipitation – could develop in the area after midnight. Smith understood from his training and experience as a bus driver that the maximum legal speed for a bus on Oklahoma highways is 65 mph, and that speeds should be slower when road conditions dictate.

6. After the movie, the Riverside students were taken to a Braum's restaurant for dinner. While the students were in the restaurant, Smith took the bus to a gas station to get fuel. At the gas station, Smith checked the weather again using his cell phone. He saw that winter weather was moving in sooner than previously expected, heading generally from west to east, and that the storm included icy conditions. He returned to the restaurant and instructed the chaperones and students

---

[1] The Court's findings are substantially based on trial testimony, however, trial exhibits that support the findings are also listed. The exhibits used by the parties mostly overlapped; for ease of reference and consistency, Plaintiff's exhibits are cited herein.

to hurry so that the group could quickly get on the road to Anadarko. Smith did not take time to eat the food that was ordered for him; he also decided to alter the return route because of the approaching inclement weather, taking the I-44 turnpike instead of secondary highways.

7. Testimony and evidence varied regarding Smith's speed of travel southwest on I-44. Smith testified that his speed range was 50-65 mph, although he may have been going 45 or 50 mph just prior to the collision; OHP Trooper Lt. Roger Peck, who talked with Smith at the scene of the collision, testified that Smith stated he was driving 60-65 mph at the time of the collision. Smith also testified that, after passing the tollbooth, seven miles from the collision site, he increased his speed to 65 mph and then decreased to 50 mph at least twice between the tollbooth and the site of the collision at mile marker 90. In light of all the evidence on this issue, the Court finds it is more probable than not that Smith was traveling between 60-65 mph immediately prior to the collision.

8. Smith testified that he saw or heard sleet on his windshield soon after getting on I-44 (going southwest out of the Oklahoma City/Moore area, the I-44 turnpike begins at mile marker 107 near Newcastle), although he stated the sleet was intermittent. D. Carroll testified that after passing the tollbooth at mile marker 97, she noticed precipitation on the windshield of the Carrolls' car. Trooper Fitzwater testified that at 11:08 p.m., when he was dispatched to the site of the collision, sleet

was coming down and the roadway on I-44 was already icy. Smith testified that the weather conditions got worse after the tollbooth and as he got closer to mile marker 90, ice started building up on the corners of the bus windshield. Smith stated that about one mile from the collision site, he saw a car stopped on the highway shoulder and the driver appeared to be cleaning his windshield wipers. When Smith got out of the bus immediately after the collision, he noticed ice accumulated on the grass near the highway shoulder; D. Carroll testified that immediately after the collision involving the bus, when she got out of her car to see what was going on, the roadway was icy and slick.

9. Just prior to 11:00 p.m., Laronna and Fred Gibbons were traveling southwest on I-44 going from Oklahoma City to Duncan; Laronna was driving the couple's 2008 Buick, and Fred was in the passenger seat. Near mile marker 90, Mrs. Gibbons, at a speed of about 60 mph, lost control of the car, hitting the barrier in the center median of the highway, and coming to rest fully within the inside (left) lane. Pl. Ex. 29.

10. The Carrolls, traveling behind the Gibbons' vehicle, saw it lose control and strike the median barrier. Mr. Carroll avoided the spinning Buick, then pulled his car onto the right shoulder of the highway and legally parked it there with its hazard lights on. Mr. Carroll asked Plaintiff to call 911 and report the accident. He then got out of his car, crossed the roadway, and attempted to render aid to the

5

Gibbons. The Gibbons' car was disabled, and its lights were not operable. Pl. Ex. 30.

11. Mr. Carroll was positioned next to the driver's side door of the Buick, on or near the inside lane shoulder, between the median barrier and the front driver's side of the Buick, speaking to Mrs. Gibbons when the bus driven by Smith struck the front passenger's side corner of the Buick. Pl. Ex. 30.

12. Just prior to the collision, Smith had been following – in his words, "shadowing" – a white pickup truck. Westbound traffic on I-44 was heavy, and Smith described it during testimony as a "constant line." After passing the tollbooth at mile marker 97, Smith shadowed the white pickup until the collision occurred. Smith passed some slower vehicles after getting on I-44, but beyond the tollbooth and within one-half of a mile of the accident site, he passed one slower-moving vehicle after it was passed by the white pickup. When the white pickup, and in-turn Smith, passed the slower-moving vehicle, they moved from the right, outside lane to the left, inside lane. During this maneuver Smith stated he "closed the distance" between his bus and the white pickup. Smith saw the white pickup start to slide, or "fishtail," as it began to move back into the right, outside lane. Smith was distracted by the fishtailing white pickup, and focused on it. He was about two bus lengths behind the pickup at that point – the bus is thirty-two feet long, thus two bus lengths is sixty-four feet. Smith saw the white pickup veer suddenly to the right; Smith

6

remained in the left lane. Smith then saw, for the first time, the disabled Buick in the left, inside lane of I-44. He was one-to-two bus lengths away from the Buick – thirty-two to sixty-four feet. He swerved to the right, but struck the Buick (because of the way the Buick was positioned, the impact was to the front passenger side of the Buick). The impact caused the Buick to rotate and strike Mr. Carroll. Pl. Exs. 1, 9, 30, 31.

13. Mr. Carroll suffered severe head trauma from the impact, and died instantly. He was 61 years old. Mr. Gibbons, in the passenger seat of the Buick, died of his injuries the following day. Pl. Ex. 13.

14. Plaintiff was sitting in the Carrolls' car, parked on the right shoulder of the highway, when the bus hit the Buick. She did not see the collision. She did not realize that Mr. Carroll had been struck and killed until another motorist came to the car window and was pointing across the highway. She looked and saw a dark form on the roadway. She got out of her car and saw a group of people gathered; someone was performing CPR on the body in the roadway. Plaintiff crossed the road, which she remembers was icy and slick, and identified her husband's body. She returned to her car, and sat down. She was comforted by a motorist who stopped to help until Plaintiff was transported to the funeral home in Chickasha.

15. Trooper Fitzwater was the lead OHP investigator assigned to the incident. He concluded that I-44 in the area of mile marker 90 was slick and

hazardous at the time of the collision, and icy conditions existed before the crash. Visibility was obscured by ice and rain. Mrs. Gibbons, who was driving at a speed of approximately 60 mph, was driving too fast for road conditions, and lost control of her vehicle, striking the median barrier and coming to rest in the left, inside lane. Trooper Fitzwater testified that R. Carroll legally parked on the right shoulder, with hazard lights on, and attempted to render assistance to the Gibbons. Trooper Fitzwater testified that it would have taken several minutes for R. Carroll to stop, cross the highway, and make contact with Mrs. Gibbons before the Buick was struck by the bus. He further testified that Smith was driving too fast for the bus to stop, under the existing road conditions, after first seeing the disabled Buick. During an interview of Plaintiff as part of the OHP investigation, she stated that after R. Carroll "stepped out of the vehicle…she noticed several vehicles going by [and] also noticed a bus go by that she thought was going to hit her vehicle." Pl. Ex. 31, p. 31. At trial, Plaintiff could not recall how many vehicles passed by while she waited in her car. Based on the volume of traffic on I-44 that evening, it is highly probable that other vehicles in addition to the white pickup passed the disabled Buick prior to the collision with the bus. During an interview at the scene, when asked how fast he thought he was going, Smith told OHP Lt. Roger Peck that his speed was 60-65 mph. Lt. Peck further testified that, at highway speeds, a two bus-length following distance is insufficient. Nevertheless, Smith did not receive a citation at the scene.

8

16. The driver of the white pickup Smith was shadowing at the time of the collision did not stop at the scene, and has never been identified. The white pickup did not collide with the Gibbons' Buick. Other than the bus, none of the vehicles that passed the disabled Buick collided with it.

17. Smith testified that the presence of R. Carroll on the roadway had nothing to do with the bus hitting the Buick, and if he were in the position of R. Carroll, he would also have stopped and rendered assistance to the Gibbons.

18. On March 1, 2014, Mr. Carroll was 61 years old, and in good health. He held a bachelor's degree and two master's degrees. He was employed full-time as the clinical director of Southwest Youth and Family Services, and was a part-time minister at Ninnekah Church of Christ in his hometown of Chickasha. In the three full years prior to his death, Mr. Carroll earned $60,987 (2011), $63,733 (2012), and $65,183 (2013). His average annual income for that three-year period was $63,301. Pl. Ex. 12, 14.

19. Mr. Carroll had a life expectancy of 81.9 years – 20.9 additional years from the date of his death. At the time of his death, Mr. Carroll had 14 years remaining in his work-life expectancy. Pl. Ex. 26.

20. Edward Heler, Ph.D., Plaintiff's damages expert, testified that he ascribed $82,760 of annual earnings to Mr. Carroll based on labor market statistics regarding the occupation of Medical and Health Services Managers. However, there

9

was no evidence indicating that Mr. Carroll had ever earned annually more than $65,183 in his position as a clinical director, and no evidence suggests that he would earn as much as $82,760 annually during his remaining work-life expectancy. The average annual earnings over the last three years before Mr. Carroll's death are about 76.5% of the amount ascribed to him by Dr. Heler. Based on his assumptions, Dr. Heler concluded that the present value of Mr. Carroll's lost earnings over the remainder of his work-life expectancy is $705,992.

21. Similarly, Dr. Heler ascribed $21.91 per hour compensation for Mr. Carroll as a part-time minister, and assumed he would work 10 hours per week in that role. However, Dr. Heler acknowledged during cross-examination that Mr. Carroll's actual rate of compensation as a part-time minister was $11.50 per hour, a little more than half of the rate assumed by Dr. Heler. Based on his assumptions, Dr. Heler concluded that the present value of Mr. Carroll's lost part-time earnings over the remainder of his work-life expectancy is $63,694. Pl. Ex. 26.

22. That aspect of Dr. Heler's analysis which relates to the personal services production capacity of Mr. Carroll over his full remaining life expectancy – described by Dr. Heler during testimony as the production of leisure for other family members – was based on a number of assumptions that are difficult to test and verify. Dr. Heler arrived at a present value of $179,229 for this production of leisure category, based on an hourly value of about $14. Weekly hours in this

10

calculation ranged from about 15 to 21 based on the life stage of the producer and the nature of the services provided. No significant evidence beyond Dr. Heler's bare calculations was offered to support this category of damages.

23. Based on all the evidence introduced at trial, the present value of lost earnings in the total amount of $571,931 is supported by the preponderance of the evidence.[2]

24. Mr. Carroll was survived by his wife, D. Carroll, his daughter, Holly Anderson, and his son, Jason Carroll. Neither Holly nor Jason lived with their parents at the time of Mr. Carroll's death, nor did they rely on their parents for financial support. However, they enjoyed a close relationship with their parents, and had frequent contact with Mr. Carroll. Both Holly and Jason experienced – and continue to experience – profound grief in connection with the death of Mr. Carroll.

25. Plaintiff and R. Carrol were married for 41 years. They enjoyed a devoted, mutually fulfilling marriage relationship, marked by respect, friendship, and love. They enjoyed spending time together, and took great joy in spending time with their immediate and extended family. They were also engaged and devoted grandparents. On March 1, 2014, Plaintiff had every reason to expect many more years together with R. Carroll.

---

[2] This is the sum of $540,084 (representing 76.5% of Dr. Heler's lost full-time earnings calculation) and $31,847 (representing 50% of Dr. Heler's lost part-time earnings calculation).

26. Plaintiff, as detailed earlier, was at the site of the collision that killed R. Carroll, and identified his body just moments after he died. The events of March 1, 2014 resulted in extreme emotional turmoil for Plaintiff, profound grief, and a substantial negative impact on her enjoyment of life.

## CONCLUSIONS OF LAW

1. Under the Federal Tort Claims Act (FTCA), the issue of negligence is to be decided in accordance with the law of the place where the acts or omissions giving rise to the claim occurred, in this case, Oklahoma. *See* 28 U.S.C. § 1346(b)(1); *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 862 (10th Cir. 2005).

2. Under Oklahoma law, negligence claims require proof of a duty, a breach of that duty, and causation. *Martinez v. Angel Exploration, LLC*, 798 F.3d 968, 974 (10th Cir. 2015) (citing *Scott v. Archon Group, L.P.*, 2008 OK 45, ¶ 17, 191 P.3d 1207, 1211). Whether a duty exists is a threshold question of law for the Court to decide. *Id*.

3. "[W]hether or not a duty exists depends on the relationship between the parties and the general risks involved in the common undertaking. ... The court decides whether a defendant stands in such a relationship to a plaintiff that the defendant owes an obligation of reasonable conduct for the benefit of the plaintiff."

*Delbrel v. Doenges Bros. Ford, Inc.*, 1996 OK 36, ¶ 7, 913 P.2d 1318, 1320-21 (citation omitted).

4. The general rule in Oklahoma is that a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks that make the conduct unreasonably dangerous. *Trinity Baptist Church v. Brotherhood Mut. Ins. Services, LLC*, 2014 OK 106, ¶ 8, 341 P.3d 75, 84. "Foreseeability as an element of duty establishes a 'zone of risk,' that is, whether the conduct 'creates a generalized and foreseeable risk of harming others.'" *Id*. at 84 (citations omitted).

5. Under Oklahoma law, a "proximate cause" is defined as one that, in a natural and continuous sequence, produces the plaintiff's injury and without which the injury would not have happened. *Woolard v. JLG Industries, Inc.*, 210 F.3d 1158, 1172 (10th Cir. 2000) (quoting *Dirickson v. Mings*, 1996 OK 2, ¶ 9, 910 P.2d 1015, 1018). A plaintiff's injury may have more than one proximate cause, i.e., "concurrent causes." *See id*. (citing *Kirkpatrick v. Chrysler Corp.*, 1996 OK 136, ¶ 10, 920 P.2d 122, 126). Under such circumstances, it has long been recognized in Oklahoma that notwithstanding the lack of concerted action and even though the act of one may not have alone caused the injury or brought about the result, concurrent tortfeasors, like joint tortfeasors, are each responsible for the entire result if the plaintiff is free from negligence. *Kirkpatrick*, 920 P.2d at 126.

6. Under Oklahoma law, "a driver of a motor vehicle must, at all times, use that degree of care which is reasonable and prudent under the circumstances. ... Therefore, a failure to exercise that degree of care which results in injury to another is actionable negligence." *Dirickson v. Mings*, 1996 OK 2, ¶ 7, 910 P.2d 1015, 1018 (citing *Agee v. Gant*, 1966 OK 31, 412 P.2d 155); *Fargo v. Hays-Kuehn*, 2015 OK 56, ¶ 13, 352 P.3d 1223, 1227 ("In applying [the elements of negligence] to automobile negligence cases, we have long recognized that drivers have a duty to operate their vehicle with due care. To fulfill this duty, a driver must do what a prudent person would do under the circumstances of each particular case.") (citations omitted).

7. Based on the referenced principles of Oklahoma law and the factual findings set forth above, in light of the weather conditions on the night of March 1, 2014, Smith owed a duty to Mr. Carroll and other drivers on I-44 to operate the bus in a safe and prudent manner and at a reasonable speed as dictated by such conditions.

8. Smith was negligent in that he breached his duty of care by "shadowing" the white pickup truck at an unsafe following distance, and traveling at speeds between 60-65 mph on an icy and slick roadway at the time of the collision.

9. Smith's failure to operate the bus in a safe and prudent manner, and traveling at speeds too fast for the bus to effectively stop in light of road conditions, were the proximate cause of the collision that resulted in Mr. Carroll's death.

10. Mr. Carroll was not contributorily negligent. He acted as a reasonable and prudent person in legally parking his car on the right shoulder of the highway and turning on its hazard lights in his attempt to render aid to the Gibbons. Clearly, Mr. Carroll managed to safely cross the highway in order to make contact with Mrs. Gibbons. Mr. Carroll was not positioned in the lanes of traffic as he attempted to help the Gibbons, but was on or immediately adjacent to the inside shoulder of the highway. Under the existing conditions at the time of the fatal collision on March 1, 2014, it was reasonably foreseeable that a concerned and conscientious motorist such as Mr. Carroll would attempt to render assistance to a disabled vehicle and its occupants on the roadway, such as the Gibbons.

11. The evidence demonstrates that Mrs. Gibbons was negligent in connection with her initial collision with the median barrier which rendered her vehicle inoperable. However, the Court finds that, based on the record evidence, it was the actions of Smith, not Mrs. Gibbons, that were the proximate cause of Mr. Carroll's injuries and death. At most, the Court determines that Mrs. Gibbons' conduct was a concurrent cause of the subject collision. However, as stated *supra*,

Mrs. Gibbons' culpability neither alleviates nor absolves Smith's liability for the collision.

12. Oklahoma's wrongful death statute, 12 OKLA. STAT. § 1053(A), provides:

> When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, or his or her personal representative if he or she is also deceased, if the former might have maintained an action, had he or she lived, against the latter, or his or her representative, for an injury for the same act or omission.

13. The damages recoverable in wrongful death actions include: (1) the loss of financial support of contributions of money to the surviving spouse and children; (2) the grief of the surviving spouse; (3) the loss of the society, services, companionship, and marriage relationship of the surviving spouse; (4) the grief of the children and parents of the decedent; (5) the loss of companionship and parental care, training, guidance, or education that would have been forthcoming from the decedent to the children, and the loss of companionship of the decedent by the children; (6) the loss of the companionship of the decedent by his parents; (7) the decedent's pain and suffering; and (8) the medical and burial expenses. 12 OKLA. STAT. § 1053(B); OKLAHOMA UNIFORM JURY INSTRUCTIONS - Civil § 8.1 (2016 Supp.).

14. Based on the findings and conclusions set forth herein, the Court awards damages to Plaintiff, as Special Administrator of the Estate of Rodney James Carroll, as follows:

    a) for the loss of financial support to the surviving spouse, damages in the amount of $571,931;

    b) for D. Carroll's grief and the loss of companionship and marriage relationship, damages in the amount of $1,000,000;

    c) for burial expenses, damages in the amount of $10,132.77;

    d) for the grief and loss of companionship experienced by Holly Anderson, damages in the amount of $200,000; and

    e) for the grief and loss of companionship experienced by Jason Carroll, damages in the amount of $200,000.

15. Defendant is entitled to a set-off of the insurance proceeds Plaintiff received from Mrs. Gibbons in the amount of $50,000. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law [Doc. No. 82], p. 15.

## **CONCLUSION**

In summary, upon consideration of all of the evidence admitted during the trial of this case, the Court finds Plaintiff has proven by the preponderance of the evidence that Laughter Smith was negligent, and such negligence was the proximate cause of the collision that resulted in Rodney James Carroll's death.

**IT IS THEREFORE ORDERED** that Plaintiff is entitled to a judgment against Defendant and for an award of damages in the total amount of **$1,932,063.77**. A separate judgment shall be entered accordingly.

**IT IS SO ORDERED** this 27th day of April 2017.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE